IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TAMIKO L. STANLEY,                              )
                    Plaintiff,                  )
                                                )
vs                                              )      Civil Action No. 15-555
                                                )      Judge Hornak
CITY OF PITTSBURGH, et al.,                     )      Magistrate Judge Mitchell
                    Defendants.                 )

I.      Recommendation

        It is respectfully recommended that the motion to dismiss the Amended Complaint filed

by Defendants City of Pittsburgh and Todd C. Siegel (ECF No. 25) be denied.  It is further

recommended that the motion to dismiss the Amended Complaint filed by Defendants Wendy

Kobee and Lourdes Sanchez Ridge (ECF No. 27) be denied.  It is further recommended that

Plaintiff be permitted to amend the Amended Complaint to set forth a § 1983 claim against

Defendant Siegel.

II.     Report

        Plaintiff, Tamiko L. Stanley, brings this civil rights action under 42 U.S.C. § 1981,

alleging that Defendants, the City of Pittsburgh, Director of the Department of Personnel and

Civil Service Commission Todd C. Siegel, City Solicitor Lourdes Sanchez Ridge and Assistant

City Solicitor Wendy Kobee, retaliated against her for raising claims of racial discrimination

when they terminated her from her position as Assistant Director of the Pittsburgh Partnership on

October 29, 2014.  She further alleges that Siegel, Sanchez Ridge and Kobee retaliated against

her on November 4, 2014 by filing a baseless criminal complaint that she had stolen print

drawings belonging to the City when she retrieved her personal belongings from the office,

which caused the police to come to her house and subject her to distress and embarrassment, and

the matter was closed without charges being filed against her.

Presently submitted for disposition are two motions to dismiss the Amended Complaint, one filed by the City and Siegel, and the other by Kobee and Sanchez Ridge. For the reasons that follow, the motions should be denied and Plaintiff should be permitted to amend the Amended Complaint to set forth a § 1983 claim against Defendant Siegel.

Facts

The City hired Plaintiff as the Assistant Director and Equal Employment Opportunity Officer for the Department of Personnel and Civil Service Commission under the administration of Mayor Luke Ravenstahl. Siegel reported to Plaintiff for a period of time during her tenure as Assistant Director. She alleges that he opposed racial diversity in the workplace, believing that it lowered the quality of the City's workforce, and that he resented reporting to Plaintiff, an African-American, so much that he demanded a transfer to another supervisor and agitated with City officials until he received it. (Am. Compl. ¶¶ 16-19.)[1]

After William Peduto was elected Mayor, Plaintiff and many other City employees were terminated from their positions and a memorandum was sent to them directing them to re-apply for their positions or any other positions in which they had interest. Plaintiff alleges that she did not receive a copy of this memorandum, but that she nevertheless applied for her own position as well as the position of Director of the Department of Personnel and Civil Service Commission. When she attempted to access the web portal to submit her applications, it was inoperative so she emailed them directly to the persons responsible for collecting and processing applications for the City. (Am. Compl. ¶¶ 20-24.)

Plaintiff states that, even though she was by far the most qualified candidate for the Director position, the City instead hired Siegel, despite his disdain for racial diversity and even

---

[1] ECF No. 24.

though he had been the subject of discrimination complaints by other employees. Moreover, once installed as the Director, Siegel refused to consider Plaintiff for her own position as Assistant Director. Plaintiff alleges that she overhead Siegel telling Jennifer Williamson, a white female, that he wanted to fire Plaintiff's "black ass." On or about May 14, 2014, Siegel transferred her to the position of Assistant Director of the Pittsburgh Partnership, which Plaintiff describes as a "diminished position under Siegel's supervision with significantly different responsibilities." (Am. Compl. ¶¶ 25-28.) Plaintiff alleges that, in a personal meeting and then again in a letter dated May 16, 2014, Siegel told her that he, Kevin Acklin (Mayor Peduto's Chief of Staff) and Debbie Lestitian (Mayor Peduto's Chief Administration Officer) had "decided and approved" this transfer, that Assistant Solicitor Kobee was present during this meeting and that both Lestitian and Kobee received copies of Siegel's letter to Plaintiff confirming the decision to transfer her. (Am. Compl. ¶¶ 11-12, 29-31.)

Following this transfer, Siegel hired Williamson to fill Plaintiff's former position. Plaintiff notes that Williamson had no prior experience at the Assistant Director level in any department of the City and was less qualified than Plaintiff for the position. Siegel then abolished the position of Equal Employment Opportunity Officer from the Department of Personnel and Civil Service Commission. (Am. Compl. ¶¶ 32-34.)

Plaintiff commenced a medical leave on or about May 14, 2014. She indicates that, through September 15, 2014, Siegel, Kobee and Lestitian made the City's final decisions with respect to her FMLA leave and short-term disability leave, including the decisions whether to approve Plaintiff's leave, for how long, and when to recall Plaintiff to work. Attorney Christian Bagin sent a Notice of Appearance on Plaintiff's behalf to Siegel on or about September 16, 2014, and thereafter represented Plaintiff in connection with Plaintiff's medical leave and

requests for reasonable accommodation under the Americans with Disabilities Act and Pennsylvania Human Relations Act, and in connection with status-based discrimination claims related to Plaintiff's employment.  The City engaged in the interactive process by and through Kobee and Assistant City Solicitor Stephanie Eggar, who each communicated with Attorney Bagin several times on the telephone, in person and via email.  Kobee, Sanchez Ridge and Eggar made the City's final decisions with respect to matters such as recalling Plaintiff to work, requesting medical documentation and other medical information to support Plaintiff's leave request, and requesting to speak directly with Plaintiff's doctors.  Defendants ultimately approved Plaintiff's medical leave through November 3, 2014.  (Am. Compl. ¶¶ 35-39.)

Plaintiff notes that Attorney Bagin continued to press her status-based discrimination claims with Kobee and Eggar both in person and via email and that, although Kobee and Eggar said that the City was "investigating" Plaintiff's discrimination claims, they did not provide details of the City's investigation or otherwise respond to his efforts to bring Plaintiff's claims to a resolution.  Therefore, on October 23, 2014, Attorney Bagin emailed a letter to Sanchez Ridge and Eggar complaining of unlawful employment discrimination against Plaintiff on the basis of her race, sex, sexual orientation, familial status and disability.  (Am. Compl. ¶¶ 40-41 & Ex. 1.)

In his letter, Attorney Bagin advised that litigation was reasonably foreseeable and instructed the City to place a litigation hold on information relevant to Plaintiff's discrimination claims.  Attorney Bagin further promised to pursue Plaintiff's claims administratively and in court if Plaintiff's claims were not amicably resolved.  Six days later, Defendants Siegel, Kobee and Sanchez Ridge terminated Plaintiff's employment.  (Am. Compl. ¶¶ 42-43.)  Plaintiff alleges that Lestitian and Acklin personally participated in the decision to terminate Plaintiff's employment by jointly making it with Siegel, Kobee and Sanchez Ridge, or, in the alternative,

by ratifying the decision after it was made. (Am. Compl. ¶ 44.)

On October 29, 2014, Siegel sent Plaintiff a letter, which stated that Plaintiff was terminated allegedly because she had "repeatedly rejected the City's offer of the Pittsburgh Partnership position." Siegel sent copies of his letter to Kobee and Lestitian. (Am. Compl. ¶ 45 & Ex. 2.) In addition, in another letter, also dated October 29, 2014, Kobee wrote to Attorney Bagin at the direction of Sanchez Ridge. The subject of Kobee's letter was "Tamiko Stanley Response to Your October 23, 2014 Correspondence to Stephanie Eggar and Lourdes Sanchez Ridge." Kobee enclosed a copy of Siegel's letter, reiterated Siegel's stated termination reason, and sent copies of her letter to Acklin, Lestitian and Sanchez Ridge. (Am. Compl. ¶ 46 & Ex. 3.)

Plaintiff contends that the termination reason given in the October 29, 2014 correspondence from Siegel and Kobee was false. Plaintiff had not rejected the Pittsburgh Partnership Assistant Director position, let alone rejected it "multiple times." In fact, Plaintiff was employed as the Pittsburgh Partnership Assistant Director, had advised Defendants that her position was a priority for her and that she looked forward to returning from medical leave, had offered to return to work early if the City refused to approve her doctors' recommendation for continued medical leave through November 3, 2014, and would have returned to her Pittsburgh Partnership Assistant Director position on November 3, 2014 but for Defendants' termination of her employment five days earlier. (Am. Compl. ¶¶ 47-48.)

Plaintiff alleges that, on or about November 4, 2014, Siegel caused a criminal complaint to be filed with the Pittsburgh Police Department seeking to have her charged with burglary and criminal trespass. Siegel alleged that Plaintiff had stolen print drawings belonging to the City when Plaintiff retrieved her personal items from the office. Plaintiff states that the prints in question had been given to her personally by a friend and were her property. She contends that

Siegel knew he lacked a good-faith and reasonable basis to assert City ownership of the prints or to file the aforesaid criminal complaint against her. Pittsburgh Police detectives confronted Plaintiff at her home, causing Plaintiff distress and embarrassment. The police investigation of Siegel's baseless criminal complaint was closed without charges. (Am. Compl. ¶¶ 49-54.)

On or about November 13, 2014, Attorney Bagin approached Sanchez Ridge at the PBI Employment Law Institute West seminar and complained of the baseless criminal complaint filed against Plaintiff. Plaintiff alleges that Sanchez Ridge replied, "What did you expect? She threatened to sue us." (Am. Compl. ¶¶ 55-56.)

<u>Procedural History</u>

Plaintiff filed this action on April 28, 2015. Federal question jurisdiction is based on the civil rights claims. On June 23, 2015, the City and Siegel filed a motion to dismiss (ECF No. 15), as did Kobee and Sanchez Ridge (ECF Nos. 13). Plaintiff filed briefs in opposition to the two motions on July 7, 2015 (ECF No. 18, 19). On July 21, 2015, this Court entered an order stating that: "it is clear that the complaint is so vague and ambiguous that the Defendants cannot reasonably prepare a response such that a more definite statement of Plaintiff's claims is required under Federal Rule of Civil Procedure 12(e)." (ECF No. 23.) Plaintiff was ordered to file an amended complaint by August 4, 2015 and the two motions to dismiss were dismissed as moot.

That same day, Plaintiff filed an Amended Complaint (ECF No. 24). Count I alleges retaliation by the City, Count II alleges retaliation by Sanchez Ridge, Count III alleges retaliation by Kobee and Count IV alleges retaliation by Siegel. On August 4, 2015, the City and Siegel (ECF No. 25) and Kobee and Sanchez Ridge (ECF No. 27) filed motions to dismiss the Amended Complaint. Plaintiff filed briefs in opposition to the two motions on August 13, 2015 (ECF Nos. 30, 31) and on September 25, 2015, Kobee and Sanchez Ridge filed a reply brief

(ECF No. 32). The City and Siegel filed their reply brief on September 28, 2015 (ECF No. 33).

Standard of Review

The Supreme Court has issued two decisions that pertain to the standard of review for failure to state a claim upon which relief could be granted. The Court held that a complaint must include factual allegations that "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "[W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice' but also the 'grounds' on which the claim rests." Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008). In determining whether a plaintiff has met this standard, a court must reject legal conclusions unsupported by factual allegations, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements;" "labels and conclusions;" and "'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 678 (citations omitted). Mere "possibilities" of misconduct are insufficient. Id. at 679. The Court of Appeals has summarized the inquiry as follows:

> To determine the sufficiency of a complaint, a court must take three steps. First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1947, 173 L.Ed.2d 868 (2009). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 1950. Third, "whe[n] there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Id. This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged.

Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

The Court of Appeals has explained that: "In deciding a Rule 12(b)(6) motion, a court

must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citation omitted).  Thus, the documents that Plaintiff has attached to the Amended Complaint (the October 23, 2014 letter from her counsel and the two October 29, 2014 letters regarding the termination of her employment) may be considered in determining whether Plaintiff has stated a claim upon which relief may be granted.  In addition, the Court can refer to the Pittsburgh Home Rule Charter and the Pittsburgh City Code sections cited by the Defendants.

The City and Siegel contend that: 1) the Amended Complaint contains the same deficiencies as the original complaint and should be dismissed for this reason; 2) a claim for retaliation under § 1981 requires pleading and proving an underlying § 1981 claim of race discrimination and she has not pleaded such a claim; 3) she identifies no policy to impose municipal liability because Siegel was not a decision maker and Acklin and Lestitian had no involvement; and 4) § 1981 provides no private right of action against a state actor and Plaintiff has sued Siegel only under § 1981, not § 1983.

Sanchez Ridge and Kobee also contend that the Amended Complaint is insufficient as was the original complaint.  In addition, they argue that: 1) Plaintiff has not alleged that they had an intent to discriminate against her on the basis of her race or that they took any action to terminate her employment and, in fact, they could not have taken any action because they work for a different department of the City and Kobee, as an Assistant Solicitor, has no power to fire anyone; 2) she fails to allege that they retaliated against her for any protected conduct because they had no power to terminate her employment and she alleges no causal connection between their act of working with Plaintiff's attorney regarding her medical leave and alleged disability

and her termination, and even the letter she attaches to the Amended Complaint mentions Kobee stating that she did not apply for certain positions; 3) they are entitled to qualified immunity because they had no authority to terminate her and providing legal advice to the City does not violate her clearly established rights; and 4) City solicitors should not be liable under § 1981, as courts have held they cannot be held liable for conspiracy under § 1985.

Plaintiff responds that: 1) the case cited by Defendants for the proposition that she must plead and prove an underlying case of racial discrimination conflicts with prior Third Circuit law, does not follow from the Supreme Court case it relies upon and has not been followed since; 2) she has alleged that she complained about racial discrimination, threatened to sue the City and made settlement demands (all protected activities), that she suffered an adverse employment action and causation, which is sufficient at this stage of the proceedings; 3) the policy was a decision made by Siegel, Acklin, Lestitian, Sanchez Ridge and Kobee or Acklin and Lestitian ratified the decision made by Siegel, who is a policy maker as the head of the department; and 4) she can amend the Amended Complaint to allege a personal capacity claim against Siegel under § 1981. With respect to the additional arguments made by Sanchez Ridge and Kobee, Plaintiff responds that: they have confused personal liability under § 1981 with municipal liability under § 1983 and their liability is based on their personal involvement; it is clearly established that the conduct she attributes to Sanchez Ridge and Kobee would violate her rights and discovery is needed to determine the scope of their involvement; and their citation to a case from the Pennsylvania Superior Court does not demonstrate that City solicitors cannot be held liable in federal civil rights cases for the legal advice they provide to their employers.

In a reply brief, Sanchez Ridge and Kobee argue that: 1) Plaintiff's attempt to have the Court ignore binding precedent from the Third Circuit is unavailing, and she cannot rely on non-

precedential decisions that were decided thereafter; 2) according to Plaintiff's own documents, her attorney complained of discrimination on September 16, 2014 and September 22, 2014, and thus her termination on October 29, 2014 was not "unduly suggestive" in its timing; and 3) qualified immunity does not apply at the generalized level Plaintiff discusses, but at the more particularized level of whether legal counsel can be held liable for an employer's decision to terminate an employee, and this determination should be made early in the case. The City and Siegel add that Plaintiff still has no support for her municipal liability allegation and the events she cites occurred prior to her attorney's letter; municipal liability cannot be based on an individual being copied on a letter and even Siegel's decision to terminate her employment, without more, does not establish policy on the part of the City.

Retaliation Claims under § 1981

Section 1981 provides as follows:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C.A. § 1981 (1991). The Supreme Court has confirmed that § 1981 covers retaliation claims. CBOCS West, Inc., v. Humphries, 553 U.S. 442 (2008). Claims brought under § 1981 are analyzed under the same standards as claims under Title VII. See Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 798 n.14 (3d Cir. 2010); Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006).

The parties agree that, in the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of discrimination indirectly following the shifting burden analysis set forth by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973) and refined in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252 53 (1981). Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 897 (3d Cir. 1987) (en banc).

If the employee presents a prima facie case of discrimination, the employer must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." McDonnell Douglas, 411 U.S. at 802. If the employer specifies a reason for its action, the employee must have an opportunity to prove the employer's reason for the adverse employment action was a pretext for unlawful discrimination. Id. at 804. The Court of Appeals has stated that:

> [T]o avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder to reasonably infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).

The parties agree that the prima facie case elements for a retaliation claim are as follows: 1) the plaintiff engaged in activity protected by the anti-discrimination statute; 2) the employer took action that a reasonable employee would have found to be materially adverse in that it

might well have dissuaded a reasonable worker from making or supporting a charge of discrimination; and 3) there is a causal connection between the plaintiff's opposition to or participation in proceedings against unlawful discrimination and the employer's action. Moore, 461 F.3d at 341-42. However, Defendants contend that, pursuant to Oliva, "[i]n a retaliation case a plaintiff must demonstrate that there had been an underlying section 1981 violation." 604 F.3d at 798 (citing CBOCS, 553 U.S. at 452). Since Plaintiff's Amended Complaint does not contain a separate claim for racial discrimination claim, Defendants argue that she cannot maintain a retaliation claim under § 1981. Plaintiff responds that Oliva conflicts with prior precedent from the Court of Appeals, that it does not follow from the Supreme Court case it appears to rely upon and that it has not been followed since. She further notes that no other court has followed it and that it has been criticized.

As an initial matter, it is noted that the shifting-burden framework cited above is not applicable when a motion to dismiss has been filed. Indeed, the Supreme Court has held that a plaintiff alleging a claim of employment discrimination need not plead "specific facts" establishing the elements of a prima facie case, as would be required in response to a motion for summary judgment or at trial. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002) (establishing a prima facie case is an "evidentiary standard, not a pleading requirement."). Thus, "an employment discrimination complaint need not include [specific facts establishing a prima facie case of discrimination under the framework of McDonnell Douglas] and instead must contain only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Id. at 508. In Twombly, the Court cited Swierkiewicz without distinguishing it and rejected the plaintiffs' contention that it "ran counter" to Twombly's plausibility standard. 550 U.S. at 569-70. Thus, Plaintiff does not have to meet the McDonnell Douglas standard at this

stage of the proceedings and she does not have to allege, much less prove, that the timing between her protected activity and the adverse employment action was "unduly suggestive."

Moreover, the Oliva case was decided on a motion for summary judgment, as was CBOCS and Ellis v. Budget Maintenance, Inc., 25 F. Supp. 3d 749 (E.D. Pa. 2014), the case Defendants cite that relied on Oliva to grant summary judgment for a defendant when the plaintiff failed to proffer any evidence of an underlying act of racial discrimination.

Applying it to the motion to dismiss context would mean that Plaintiff would have to allege that she complained about racial discrimination and was retaliated against for such complaints.[2] Plaintiff has alleged that she was subjected to racial discrimination in the workplace and she need not "prove" anything at this early stage of the proceedings. She alleges that, after Siegel became the Director of the Department of Personnel and Civil Service Commission, he refused to consider her for her own position even though she was the most qualified person; that she overheard him tell another employee that he "wanted to fire Plaintiff's 'black ass'"; that he transferred her to the diminished position of Assistant Director of the Pittsburgh Partnership; and that he hired a white female to replace her. (Am. Compl. ¶¶ 26-28, 32.) The letter dated October 23, 2014 from Attorney Bagin to the City explicitly states that she had made an "employment discrimination complaint on the basis of her sex, race, sexual orientation, familial and disability status and in retaliation for protected activity." (Am. Compl. Ex. 1 at 1.) The letter goes on to cite numerous examples of discriminatory behavior Plaintiff was claiming the Defendants exhibited.[3]

---

[2] Plaintiff does not suggest that she could make any sort of complaint (say, about a company uniform she did not like) and that such complaint would serve as "protected activity" if she suffered an adverse employment action thereafter. The complaint must be about racial discrimination or it does not fall within the ambit of § 1981.
[3] The City and Siegel argue, somewhat bizarrely, that the letter "is no substitute for pleading an

Although the Amended Complaint does not contain a separate claim for racial discrimination (as opposed to retaliation), it cannot be said that Plaintiff will be unable to proffer evidence of underlying racial discrimination to support the basis for her protected activity. The Oliva case does not hold that a plaintiff must include a separate count for underlying racial discrimination. Plaintiff has pleaded sufficient information at this stage of the proceedings and this argument should be rejected.

Municipal Policy

The City further contends that Plaintiff has provided no basis upon which to support a finding of municipal liability. Plaintiff responds that Siegel is a policymaker for the City.[4]

The Supreme Court has held that:

[A] local government may not be sued under § 1983 for any injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury that the government as an entity is responsible under § 1983.

Monell v. Department of Social Servs. of City of N.Y., 436 U.S. 658, 694 (1978). A plaintiff must demonstrate that the decision-maker, through deliberate conduct, was the "moving force" behind the alleged injury, Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000), and must show an "affirmative link" or "plausible nexus" between the custom or practice and the plaintiff's alleged deprivation of constitutional rights, Bielevicz v. Dubinon, 915 F.2d 845, 850-51 (3d Cir. 1990).

express cause of action in a distinct Count." (ECF No. 26 at 11.) As noted in the text, no case holds that Plaintiff has to plead an express cause of action for racial discrimination in a separate count, and "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c).
[4] Plaintiff also argues that Acklin and Lestitian are policymakers, and Defendants respond that the Amended Complaint contains no facts indicating involvement by these individuals. The Court need not reach this issue.

The City's Home Rule Charter provides that "removals of subordinate officers and employees within major administrative units shall be made by the major administrative unit head on the basis of the system adopted." Pittsburgh Home Rule Charter, Art. 7, § 701. Siegel, as the Director of the Department of Personnel and Civil Service Commission, is a major administrative unit head with the authority to terminate Plaintiff's employment. See Pittsburgh Code §§ 145.01, 180.01(f), 180.04(a). Thus, under state law, he is a policymaker and his acts are relevant for purposes of the City's liability.

The City cites Santiago v. Warminster Township, 629 F.3d 121, 135 (3d Cir. 2010), for the proposition that: "The allegation that Chief Murphy ordered a plan to execute arrest warrants does not imply the existence of an official policy in violation of Santiago's constitutional rights." The Santiago case is distinguishable from this case in two fundamental respects. First, the court in Santiago had already held that the plaintiff failed to allege that Chief Murphy was a final policymaker and that under state law he was not. More significantly, in that case, the plaintiff alleged that police officers subjected her to excessive force when they raided her house looking for her grandson and the Chief's involvement consisted solely of planning the arrest warrant (the other occupants of the house did not allege that they were subjected to excessive force, so there was no "policy" alleged in the planning itself). Here, by contrast, Plaintiff is alleging that Siegel terminated her employment with the City in retaliation for her having complained about racial discrimination, and the termination is the very act which forms the basis of her Amended Complaint. Thus, the City cannot contend that Siegel's alleged actions were somehow divorced from her injury, as was the case in Santiago. Rather, he was the "moving force" behind her injury. Based upon the allegations of the Amended Complaint, the City may be liable for Siegel's actions and its argument for dismissal for lack of municipal liability should be rejected.

The Court of Appeals has confirmed that "no private right of action exists against state actors under 42 U.S.C. § 1981." <u>McGovern v. City of Phila.</u>, 554 F.3d 114, 122 (3d Cir. 2009). Rather, "while § 1981 creates <u>rights</u>, § 1983 provides the <u>remedy</u> to enforce those rights against state actors." <u>Id.</u> at 116. Thus, in <u>McGovern</u>, an employee could not utilize § 1981 to sue the City of Philadelphia for race discrimination and, because any potential claim he could have asserted under § 1983 was time barred by that statute's two-year statute of limitations, he had no ability to bring a claim at all.

Siegel thus contends that, because Plaintiff has not sued him under § 1983, she cannot maintain a § 1981 claim against him as a state actor. Plaintiff responds that, to the extent Siegel was acting under color of state law when he terminated her employment and filed the retaliatory criminal complaint, a cause of action would lie against him individually under § 1983 and she requests leave to amend the Amended Complaint to add one.

"Individual defendants may be held liable under 42 U.S.C. § 1981 if they are personally involved in intentional acts of discrimination." <u>Murthy v. Indiana Univ. of Pa.</u>, 2013 WL 1363924, at *3 (W.D. Pa. Apr. 3, 2013) (citing <u>Al-Khazraji v. St. Francis College</u>, 784 F.2d 505, 518 (3d Cir. 1986)). Furthermore, "liability is not limited to the initial act of discrimination, but extends to those who authorize or otherwise participate in the alleged discriminatory conduct." <u>Id.</u> Construing the allegations in Plaintiff's favor, Siegel may be held liable, either in his official capacity for acting under color of state law or in his individual capacity. Therefore, this argument should be rejected.

<u>Involvement of Sanchez Ridge and Kobee</u>

The City has separate executive departments for Law, Pittsburgh Code § 111.01(a)(5), and Personnel and Civil Service, § 111.01(a)(8). The City Solicitor is head of the Department of

Law, § 125.01.  However, as Kobee and Sanchez Ridge observe, neither the Solicitor nor any Assistant Solicitor would have any authority to terminate an employee of the Personnel Department, such as Plaintiff.  Moreover, Kobee, as an Assistant Solicitor, would not have authority to terminate anyone even in her own department.

As noted above: "Individual defendants may be held liable under 42 U.S.C. § 1981 if they are personally involved in intentional acts of discrimination."  Murthy v. Indiana Univ. of Pa., 2013WL 1363924, at *3 (W.D. Pa. Apr. 3, 2013) (citing Al-Khazraji v. St. Francis College, 784 F.2d 505, 518 (3d Cir. 1986)).  Furthermore, "liability is not limited to the initial act of discrimination, but extends to those who authorize or otherwise participate in the alleged discriminatory conduct."  Id.  Plaintiff thus argues that, unlike municipal liability, the issue with respect to Sanchez Ridge and Kobee is not whether they had authority to terminate her employment under state and local law, but whether they actually participated in the alleged discriminatory acts.

The October 29, 2014 letter from Kobee states that "Sanchez Ridge asked me to respond to … [Attorney Bagin's] October 23, 2014 Correspondence to Stephanie Eggar and Lourdes Sanchez Ridge."  (Am. Compl. Ex. 2.)  The letter then proceeds to state that, allegedly because of Plaintiff's repeated refusal to accept the City's offer of the Pittsburgh Partnership Assistant Director position, and "pursuant to Todd Siegel's letter, attached, her employment with the City of Pittsburgh is terminated effective immediately."  Id.  Thus, the Amended Complaint, including its attached exhibits, allows for the inference that, in response to Plaintiff's counsel's letter raising issues concerning, inter alia, racial discrimination, she was fired six days later and that Sanchez Ridge and Kobee had some level of involvement in the matter.

In addition, Plaintiff has alleged that Siegel deliberately filed a baseless criminal

complaint against her and that, when confronted about it, Sanchez Ridge responded: "What did you expect? She threatened to sue us." (Am. Compl. ¶¶ 55-56.) This allegation allows for the inference that Sanchez Ridge had some level of involvement with this action. At this stage of the proceedings, Plaintiff has pleaded sufficient involvement by Sanchez Ridge and Kobee and this argument for dismissal should be rejected.

Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity is an objective decision to be decided by the court as a matter of law. Carswell v. Borough of Homestead, 381 F.3d 235, 242 (3d Cir. 2004). Moreover, the Supreme Court has stressed that the qualified immunity question must be resolved "at the earliest possible stage in the litigation." Saucier v. Katz, 533 U.S. 194, 201 (2001).

Sanchez Ridge and Kobee argue that the Amended Complaint fails to establish a violation of a constitutional right and also that a reasonable person in their position would not have been aware that his conduct violated Plaintiff's clearly established rights. Plaintiff disputes each of these contentions.

In In re Montgomery County, 215 F.3d 367 (3d Cir. 2000), the plaintiff was a county employee (Wright) who was fired from his position by the county commissioners. The defendants argued that they were entitled to qualified immunity on the ground that their decision to terminate Wright was based on an audit report which suggested that he was a poor manager or that he might have been guilty of potentially criminal conflicts of interest. The Court of Appeals

held that this argument was misplaced:

> Wright has not alleged that the Appellants' reliance on the audit report was unreasonable. Quite to the contrary, he alleges that the Appellants' claimed reliance on the report is merely a pretext. The Appellants terminated him, Wright alleges, in retaliation for speaking out against the County's allegedly racially discriminatory employment practices.  There is no question that such racially-based retaliation would violate a right that was clearly established at the time Wright was terminated.

> Whether the Appellants' decision to terminate Wright was made in response to HUD's audit findings as they claim, or in retaliation as Wright alleges, is a question of fact to be decided in the District Court.

Id. at 377 (footnote and citations omitted).  Thus, this case holds both that it is clearly established that terminating an employee in retaliation for the employee's speaking out against racial discrimination violates the law and that the determination of whether this occurred is a factual matter.  Such a factual determination cannot be resolved in the context of a motion to dismiss.  Therefore, the argument based on qualified immunity should be rejected.

Liability of Municipal Solicitors

The final argument presented by Sanchez Ridge and Kobee is that municipal solicitors should be immune from suit under § 1981.  Although they concede that they have found no case that supports this contention, they rely by analogy on a case that held that, for purposes of § 1985 conspiracy claims to interfere with civil rights: "Plaintiff's alleged conspiracy claims are based on the attorney-client relationship between the Defendants, while acting in their legal capacity, and the School Districts, and therefore can not support a claim under section 1985." N'Jai v. Floyd, 2008 WL 618650, at *2 (W.D. Pa. Mar. 3, 2008), aff'd, 386 F. App'x 141 (3d Cir. July 8, 2010).  They also cite a case from the Pennsylvania Superior Court, in which a concurring and dissenting opinion would have limited the potential liability of municipal solicitors to those situations in which they engaged in a course of conduct amounting to fraud and manifesting

malice toward the party adversely affected by the municipality's decision. See Urbano v. Meneses, 431 A.2d 308, 314-15 (Pa. Super. 1981) (Watkins, J., concurring and dissenting).

Plaintiffs respond that the majority opinion in the Urbano case merely quashed the appeal on procedural grounds, that Urbano was decided under Pennsylvania law and that federal case law has rejected the notion of absolute immunity for prosecutors giving legal advice to the police, for example. See Burns v. Reed, 500 U.S. 478, 496 (1991). This Court agrees: under federal law, which governs the question of immunity in this case, City solicitors are prosecutors who are entitled to qualified immunity (under appropriate circumstances), not complete quasi-judicial immunity from suit as advocated by Judge Watkins' opinion in Urbano.

For these reasons, it is respectfully recommended that the motion to dismiss the Amended Complaint filed by the Defendants City of Pittsburgh and Todd C. Siegel (ECF No. 25) be denied. It is further recommended that the motion to dismiss the Amended Complaint filed by Defendants Wendy Kobee and Lourdes Sanchez-Ridge (ECF No. 27) be denied. It is further recommended that Plaintiff be permitted to amend the Amended Complaint to set forth a § 1983 claim against Defendant Siegel.

Litigants who seek to challenge this Report and Recommendation must seek review by the district judge by filing objections by December 8, 2015. Any party opposing the objections shall file a response by December 22, 2015. Failure to file timely objections will waive the right of appeal.

Respectfully submitted,

s/Robert C. Mitchell_____
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: November 24, 2015